Filed 1/10/14  In re Elise W. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re Elise W., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT, Plaintiff and Respondent, v. Danielle D., Defendant and Appellant. | A136845 (Sonoma County Super. Ct. No. 3718-DEP) |

Danielle D. (Mother) appeals from an order terminating her parental rights to her daughter, Elise W.  The court had previously ordered a bypass of reunification services in the case based on Mother's failure to reunify with Elise's older half-siblings.  We affirmed that order on writ review.  Mother argues the termination order should be reversed because (1) Elise's father reported Indian ancestry and Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.) notice requirements were not satisfied; (2) Mother was denied a proper hearing on her request to represent herself at the contested termination hearing; (3) Mother's petition for modification of the order bypassing services was improperly denied without a hearing; and (4) the trial court erred in ruling that the beneficial parental and sibling relationship exceptions to termination of parental rights did not apply.  We conclude the trial court's finding that the Sonoma County Human Services Department (Department) fulfilled ICWA notice requirements is not supported

1

by substantial evidence and we order a limited remand to correct the error. In all other respects, we reject Mother's arguments on appeal.

## I.    BACKGROUND

Even before Elise was born in 2011, Mother had a long history of substance abuse and domestic violence issues and had been the subject of multiple child welfare referrals involving Elise's half-siblings, Adan (born in 2002) and Eden (born in 2004) (hereafter Siblings). In January 2008, Mother and the Siblings were found living in a home with no heat or electricity and the children were hungry and cold; local police identified Mother as a known methamphetamine user. In May 2008, another domestic violence incident occurred between Mother and the Siblings' father—at least the fourth such incident between the two—and Mother had alcohol on her breath at the time of the incident. In June 2008, Mother was found with Eric W. (Elise's father; hereafter Eric), who was under an order to stay away from Mother because he had broken her jaw in a previous domestic violence incident. In September 2008, the family home was found to be filthy and without edible food. An adult male, D.W., was living there with Mother and methamphetamine and marijuana pipes were openly displayed in the bedrooms. In December 2008, the home was again found to be filthy and unsafe. D.W. was again present, and he and Mother were both uncooperative with investigating officers, while another man in the home was arrested on outstanding warrants.

A.    *Siblings' Dependency Case*

In December 2008, the Department filed a juvenile dependency petition on behalf of the Siblings pursuant to Welfare and Institutions Code section 300.[1] The petition alleged that Mother failed to provide the Siblings with adequate food, clothing, shelter or medical care, in part due to her substance abuse, and that Mother had a history of domestic violence that exposed the children to the risk of harm. At a January 2009

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

jurisdiction and disposition hearing, the court sustained an amended petition, ordered the children removed, and granted reunification services to both parents.

During 2009, Mother completed an inpatient alcohol abuse treatment program, participated in therapy, and was positive and appropriate during visits with the Siblings. After successful overnight visits, the Siblings were placed with Mother on a trial home visit in November 2009. At a 12-month review hearing in December 2009, the court granted Mother an additional six months of reunification services and scheduled a status review hearing for February 2010.[2] Mother made further progress and, at a March 2010 status review hearing, the court formally returned the children to Mother's care and granted Mother six months of family maintenance services.

In May 2010, Eric came to Mother's home uninvited and intoxicated, stole money from Mother, tried to get her to drink vodka, threatened to kill her, punched her in the head, dragged her by the hair, and choked her to the point of her almost causing her to lose consciousness. Mother was able to get someone to take the children out of the home and call the police, and she cooperated with the police investigation and obtained a restraining order against Eric. In July 2010, Mother was found in her home with a man who had a known substance abuse problem and a criminal history, although Mother did not show signs of intoxication. In other respects, the Siblings' stay in Mother's care was going well. The children were happy and doing well developmentally, the home was usually clean and stocked with food, and Mother continued to test negative for drugs and alcohol and to participate in services. At a September 2010 hearing, the court extended Mother's family maintenance services for an additional six months.

B.      *Birth of Elise*

In January 2011, Mother gave birth to Elise. Eric was incarcerated for the May 2010 assault on Mother and was scheduled to be released in June. Mother said she did not want to resume her relationship with Eric, but she wanted him to have a relationship with Elise if he changed his lifestyle. In January 2011, Mother allowed the

_____

[2] The Siblings' father's services were terminated.

3

Siblings' father to stay overnight in her apartment, and he verbally and physically assaulted Mother while she was in bed with Eden. Mother agreed to limit her contact with him and to return to individual therapy. At a March 2011 status review hearing, the court granted Mother an additional six months of family maintenance services, but expressed concern about Mother's ability to handle Eric's possible demands to see Elise when he was released from custody.

In July 2011, Mother allowed Eric into her home following his release from prison in violation of a restraining order. He was reincarcerated for violating the order and was scheduled to be released again in six months. That same month, Mother's home was found to be filthy and unsafe and the children were left in the care of Jason J., a parolee with an outstanding arrest warrant who appeared to be under the influence of a drug, possibly methamphetamine. The following month Mother missed three drug tests. On August 15, she was found walking with her children and Jason J., who had alcohol on his breath and initially fled when he saw police. Mother also smelled of alcohol and had a backpack that contained a partially consumed 40-ounce beer. On August 19, Mother was pulled over for failing to stop at a stop sign. The officer discovered that Mother was driving with a suspended license and without insurance, and the inside of her car was filthy, foul-smelling and unsafe. All three children were in the car. Mother was arrested for felony child endangerment and violation of probation, and the children were taken into protective custody.

C.    *Dependency Petition for Elise and Bypass of Services*

On August 24, 2011, the Department filed a juvenile dependency petition on behalf of Elise pursuant to section 300, subdivisions (b), (g), and (j). The petition alleged Mother's substance abuse history and recent relapse, her domestic violence history, the circumstances of her August 19 arrest, Eric's substance abuse and domestic violence history (including the May 2010 incident), the parents' incarceration, and the sustained petitions and removal (but subsequent return) of the Siblings. A supplemental petition was also filed on behalf of the Siblings, and all of the children were removed from Mother's care. Elise was placed in foster care and adjusted well to her placement,

4

appearing happy and healthy. Mother minimized the allegations of the new petition, but her visits with Elise were appropriate and engaging and she was gracious toward the foster parent.

The Department recommended a bypass of services in Elise's case for Mother.[3] The Department acknowledged that Mother had several strengths as a parent, but observed that she "continue[d] to bring people and situations into her children's lives that jeopardize[d] their safety." Despite years of services, four significant incidents in the previous nine months had forced the Department to question Mother's judgment. "[Mother] has managed to raise two extremely resilient children and one very happy baby. But love and ingenuity are not enough to protect children. [Mother's] long history of domestic violence and addiction has undoubtedly scarred her children and the Department can no longer stand by and allow it to happen."

The Department also recommended a bypass of services for Eric, who had an extensive criminal history. Eric was incarcerated at San Quentin and scheduled to be released on December 2, 2011. He appeared in court with counsel on December 12 and requested paternity testing, which the court ordered.

At a January 17, 2012 contested disposition hearing, the focus was on whether Mother had made reasonable efforts to treat the problems that had led to the removal of the Siblings.[4] (See § 361.5, subd. (b)(10).) After taking the matter under submission, the court announced its ruling on January 24, reconsidered the ruling sua sponte, and announced a new ruling on February 7. The court declared Elise a dependent child, removed her from Mother's custody, and ordered a bypass of services for both parents. Mother challenged the order by writ petition, which we denied. (*Danielle D. v. Superior Court* (May 21, 2012, A134645) [nonpub. opn.].)

---

[3] In the Siblings' case, the Agency recommended removal and termination of services for Mother. At a November 2011 hearing, the court removed the Siblings, terminated Mother's services, and set a section 366.26 hearing on termination of parental rights for March 29, 2012.

[4] As of January 17, 2012, Eric's whereabouts were unknown.

5

Elise's section 366.26 hearing was scheduled for June 7, 2012. In a May section 366.26 report, the Department recommended termination of parental rights in Elise's case.[5] Elise was living in a foster home with the Siblings and had a positive relationship with them. She had a healthy attachment to the foster parents, who were planning to adopt her while maintaining the sibling relationship. Visits with Mother had been positive and appropriate, but the foster parents reported that Elise was showing signs of confusion about Mother's role in her life. Adoption specialists who reviewed Elise's case concluded that the benefits of maintaining Elise's relationship with Mother did not outweigh the benefits of the permanency of adoption for Elise.

At the June 7, 2012 hearing, Eric was present and the parties had documentation of his biological paternity. Both parents requested a contested section 366.26 hearing, which was ultimately scheduled for September 18.[6]

D.      *Section 388 Petition*

On July 9, 2012, Mother filed a section 388 petition to modify the order bypassing services and setting the section 366.26 hearing. She asked that Elise be returned home with family maintenance services or that her visitation be increased and the section 366.26 hearing delayed or cancelled. In opposition to similar petitions filed in the Siblings' case, the Department submitted two police reports, which disclosed the following. Mother reported to police a January 30–31, 2012 domestic violence incident perpetrated by Eric after he was released from custody. Eric approached Mother and asked to talk. Because she was afraid he would become violent if she refused, she agreed and walked with him away from Mother's companions. As they approached a trailer, Eric grabbed Mother, held a screwdriver to her throat, dragged her under a canopy where the others could not see them, and urged her to go with him to a tent where he was

---

[5] In March 2012, the Department had recommended termination of parental rights and adoption as the permanent plan for the Siblings.

[6] On September 18, 2012, Eric signed a statement regarding paternity acknowledging he was Elise's father and the Department stipulated that he was Elise's biological father.

6

staying. She stalled and apparently passed out. "Her next memory was waking up in [Eric's] tent." She tried to leave the tent, but Eric became mad and hit her hard in the stomach and chest, dragged her down by the hair, threatened to kill her, and put his hands around her throat. She begged him to let her go and he eventually released her, but he said if he saw her with another man he would slit their throats. Based on the report, Eric was charged with kidnapping, false imprisonment, assault with a deadly weapon, domestic violence, and making criminal threats. About four months later, apparently on the very day Eric was released from custody following his arrest for the January incident, an officer saw Mother walking with Eric at about 11:00 p.m., and Eric was arrested for violating a restraining order.[7]

The section 388 petitions were discussed at a July 13, 2012 hearing and are described in more detail *post*. After both sides were heard on the matter, the court denied a hearing on the petitions.

E.      *Section 366.26 Hearing*

At Elise's section 366.26 hearing on September 18, 2012, the testimony focused on whether the beneficial parental relationship exception to termination of parental rights applied. At the conclusion of the hearing, the court ruled that the beneficial parental relationship exception did not apply and terminated Mother's parental rights.

## II.      DISCUSSION

A.      *ICWA Notice*

Mother argues the trial court erred in finding that ICWA notice requirements were satisfied and that ICWA did not apply to Elise. We review such findings for substantial evidence. (*In re J.T.* (2007) 154 Cal.App.4th 986, 991.) We conclude the court's ICWA findings are not supported by substantial evidence and we order a limited remand to resolve the error.

---

[7] In her section 388 petition, Mother wrote, "I recently encountered [Eric] in Sebastopol and had a brief conversation to see if he was staying in town or not, so that I could determine whether to find another place to stay. He was taken into custody for violating the Criminal Protective Order."

1.    *Factual Background*

In its September 2011 jurisdiction and disposition report, the Department wrote that the ICWA does or may apply to Elise. Eric had reported that his father and grandfather were enrolled members of the Cherokee Nation. Eric had also provided the following family history: "[Eric] was born . . . in Philadelphia, Pennsylvania to Diane [F.] and Alfred [W.] His parents were married at the time of his birth [in 1977]; however, they divorced when [he] was about four years old. [He] has a younger brother who was born in 1979 and currently resides in Hampton, Connecticut. At the age of six or seven, [Eric] and his brother moved to Hampton, Connecticut with their mother who worked full-time as a hair dresser." The Department also reported that Eric was incarcerated at San Quentin as of July 21, 2011, and was scheduled to be released on December 2, 2011.

On October 3, 2011, the Department sent ICWA notices to the Cherokee Nation in Tahlequah, Oklahoma, the United Keetoowah Band of Cherokee in Tahlequah, Oklahoma, the Eastern Band of Cherokee in Cherokee, North Carolina, the Bureau of Indian Affairs (BIA), the Secretary of the Interior, and the parents. The notices provided the name, birthdate and place of birth for Elise and Mother, the name and birthdate of Eric, the names and birth places (states only) of Eric's father and grandfather, and some information about Mother's parents and Eric's mother and grandmother.[8] The Department filed a copy of the notice in the trial court record. A photocopy of overlapping return receipts from the three tribes, BIA and Secretary of the Interior is included in the appellate record, but the photocopy does not clearly show signatures confirming receipt by the Cherokee Nation, United Keetoowah Band, or Secretary of the Interior. It is not clear whether the original return receipts or the same photocopy was filed in the trial court.

---

[8] In September 2011, the Department had filed and mailed a different version of the ICWA Notice that apparently included some errors. When the Department sent the October notice, it told the tribes to disregard the earlier notice.

In the February 7, 2012 jurisdiction and disposition order (which included the order to bypass services), the court adopted an ICWA finding the Department had initially proposed in its September 2011 jurisdiction report: "There is currently insufficient information to determine if the minor may be an Indian child[.] [T]he parents are ordered to assist the Department in its investigation, and the Department will update the Court by the next hearing and seek the appropriate ICWA findings."[9]

In its May 2012 section 366.26 report, the Department wrote: "On January 24, 2012, the Court found that there was insufficient information to determine . . . if the minor may be an Indian child and requested that the parents assist the Department. The undersigned has reviewed the case file and has determined that the requested information has not been obtained. The Cherokee Nation has requested the maternal grandfather's middle name and date of birth, and the paternal great grandmother's maiden name, middle name, and date of birth. The undersigned has sent a written request for information to the mother and father and will provide[] the Cherokee Nation[] said information upon receipt." "The undersigned" was Patricia Ramano, a social worker who was assigned to the case in March 2012, or earlier. The response from the Cherokee Nation is not in the record. In this report, the Department wrote that Eric's whereabouts were unknown.

Eric was present at a June 7, 2012 hearing. A "court officer" informed the court, "I did note in the report, the social worker is very specific about some un[res]olved [ICWA] issues, specifically related to [Eric], [and] needing information about the paternal [grandparents] . . . . I did speak to [Eric] this morning. He said he did not have that information and the person that would have that information is his [m]other, Diane [F.] and he did provide a phone number for her. I would be talking to [the social worker] in an effort to obtain that information."

At the September 2012 section 366.26 hearing, Ramano testified that she had received the name and number of Diane F. on June 7 and had "called her on several

---

[9] The same finding was in the superseded January 24, 2012 order.

9

occasions" left at least one message, but had not heard back from her. When later asked to specify how many times she had called Diane F., Ramano said, "I know I've called her at least a couple of times and left a message."[10] Ramano had also "sent letters to both [parents] requesting" the maternal grandfather's middle name and date of birth, but never received the information. She testified that she let the Cherokee Nation know in late June that she was not able to get the information. When Mother's counsel attempted to cross-examine the social worker about the notices sent to the tribes, the social worker was not able to answer because she did not have the notices with her and she had not personally sent out the notices, a task that is performed by the Department's legal/clerical department. Minor's counsel asked whether the social worker had contacted other relatives who might have the information. The social worker answered, "Like I said, I only got the information back from the Court Officer on June 7th which indicated that [Diane F.] would have this information."

On this testimony and without argument by counsel, the court found that ICWA notice requirements had been satisfied and there was no basis to find that the ICWA applied.

2.     *Analysis*

The ICWA requires that "[i]n any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child *shall notify* the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." (25 U.S.C. § 1912(a), italics added.)

Noncompliance with ICWA notice requirements has been a persistent problem in this state's juvenile courts. (See *In re I.G.* (2005) 133 Cal.App.4th 1246, 1254–1255.) In 2006, the Legislature addressed the problem by enacting strict notice requirements that

---

[10] Ramano identified the number as one with a 510 area code (which covers the area immediately east of San Francisco Bay) and Eric had previously suggested that his mother lived in Connecticut. However, Eric was at the hearing and did not protest.

had previously been included in nonbinding federal regulations. (*In re J.T., supra,* 154 Cal.App.4th at p. 993; § 224.2; 25 C.F.R. § 23.11(a), (d), (e) (1994); see also *In re W.B.* (2012) 55 Cal.4th 30, 52, 56 [purpose of 2006 legislation was to increase compliance with ICWA]; § 224, subd. (d) [any applicable law that provides a higher standard of protection prevails over ICWA].) As relevant here, the 2006 enactments (which are still in effect) provide that notice must include "all of the following information: [¶] . . . [¶] (C) All names known of the Indian child's biological parents, grandparents, and great-grandparents, or Indian custodians, including maiden, married and former names or aliases, as well as their current and former addresses, birthdates, places of birth and death, tribal enrollment numbers, and any other identifying information, if known." (§§ 224.2, subd. (a)(5), 224.3, subd. (d); see also Cal. Rules of Court, rule 5.481(b).)[11] The social services agency must continue to provide notice of each hearing unless and until the court finds the ICWA does not apply to the case. (§ 224.2, subd. (b).) Moreover, even after the court makes such a finding, the agency must send supplementary notice if it thereafter receives new information that should be included in an ICWA notice if known. (§ 224.3, subd. (f).)

The 2006 enactments also impose affirmative duties to inquire about and investigate a child's potential Indian child status. Section 224.3 provides that the court and the social services agency "have an affirmative and continuing duty to inquire whether a child [in dependency proceedings] is or may be an Indian child . . . ." (§ 224.3, subd. (a); see also rule 5.481(a)(1).) This duty is triggered if a person having an interest in the child "provides information suggesting the child is a member of a tribe or eligible for membership in a tribe or one or more of the child's biological parents, grandparents, or great-grandparents are or were a member of a tribe." (§ 224.3, subd. (b)(1); see also rule 5.481(a)(5).) Upon receiving such information, the social worker "is required to make further inquiry regarding the possible Indian status of the child, and to do so as soon as practicable, by interviewing the parents, . . . and extended family members to

_____

[11] All further rule references are to the California Rules of Court.

gather the information" that should be included in the notice if known, and must "contact[] the [BIA] and the State Department of Social Services for assistance in identifying the names and contact information of the tribes in which the child may be a member or eligible for membership in and contact[] the tribes and any other person that reasonably can be expected to have information regarding the child's membership status or eligibility." (§ 224.3, subd. (c); see also rule 5.481(a)(4).)

Finally, the 2006 enactments require the social services agency to create a record in the trial court of its notice efforts. "Proof of the notice, including copies of notices sent and all return receipts and responses received, shall be filed with the court in advance of the hearing," with exceptions not relevant here. (§ 224.2, subd. (c); see also rule 5.482(b).) If adequate notice has been provided and neither a tribe nor the BIA provides a determinative response within 60 days of receiving the notice, the court may determine that the ICWA does not apply. However, if the tribe or BIA later confirms that the child is an Indian child, the court must reverse its determination. (§ 224.3, subd. (e)(3); rule 5.482(d).)

As far as the record before us shows, the Department did not fully comply with these requirements. First, the Department failed to make an adequate record of its notice efforts. The Cherokee Nation's response is not in the record and we cannot determine whether legible copies of the return receipts are in the trial court record. Without these documents, the trial court could not properly determine whether the notice requirements were satisfied. (See *In re Mary G.* (2007) 151 Cal.App.4th 184, 210–211 [finding ICWA notice error in part because tribal response was not filed in the record].) Second, the record before us suggests that the Department failed to fulfill its affirmative duty of inquiry and investigation. In the September 2011 jurisdiction report, the Department acknowledged it had insufficient information to determine if Elise was an Indian child and that it would benefit from assistance from the parents. However, nothing in the record indicates that it sought assistance from the parents between September 2011 and June 2012, when a court officer finally obtained family contact information from Eric. The Department had the ability to contact Eric in the fall of 2011, and again from

12

February to about May 2012, when he was incarcerated. The Department also had been given substantial information about Eric's extended family, including the name of the city where his mother and brother were, or had been, living. But there is no evidence it attempted to use that information to gather more detail about Elise's possible Indian ancestry.

More specifically, it does not appear that the Department fulfilled its affirmative duty to follow up on the response it received from the Cherokee Nation. Although the record does not indicate when the response was received, it likely was received in the fall of 2011, as the statutory waiting period for tribal responses is 60 days. (§ 224.3, subd. (e)(3); rule 5.482(d).) The first mention of the response, however, is in the May 2012 section 366.26 report. Ramano writes that she only obtained information about ICWA compliance by reviewing the case file. Similarly, at the September 2012 hearing, she was unable to testify fully about the Department's ICWA compliance efforts because she did not have the file in her possession, and explained she had not done the work herself. Even after she obtained a phone number for Diane F. in June 2012, Ramano apparently only made two phone calls and left one message to attempt to obtain the needed information.[12]

On these facts, we cannot conclude that substantial evidence supports the trial court's finding that the ICWA did not apply to Elise's case. (See *In re A.G.* (2012) 204 Cal.App.4th 1390, 1397 [reversal where notice was incomplete and evidence was insufficient that agency adequately inquired and investigated to obtain missing information].)

The Department complains that Mother and Eric failed to provide the needed information. The parents' failure to act, however, does not excuse noncompliance where

---

[12] Two other ICWA notice errors are apparent from the record, although Mother does not discuss them in her appellate briefs. First, the information on the notices was incomplete, as the amended October 2011 notices did not include Eric's birthplace even though it was reported in the September 2011 jurisdiction report. Second, the Department apparently did not continue to send ICWA notice of hearings in the case up to the September 2012 hearing when the court found that the ICWA did not apply.

13

the information was or might have been available from other sources. On the related issue of a parent's failure to object to ICWA findings in the trial court, courts have repeatedly held that "ICWA notice issues cannot be forfeited for appeal by a parent's failure to raise them in the juvenile court, because it is the tribes' interest, not the parents,' that is at stake in dependency proceedings that implicate ICWA. [Citations.]" (*In re A.G., supra,* 204 Cal.App.4th at p. 1400.)

3. *Harmless Error*

The Department urges that any deficiencies in ICWA notice were in any event harmless. We reluctantly disagree.

" 'Deficiencies in an ICWA notice are generally prejudicial, but may be deemed harmless under some circumstances. [Citations.]' [Citation.]" (*In re S.E.* (2013) 217 Cal.App.4th 610, 615.) The Department argues Mother failed to demonstrate prejudice because she made no showing on appeal that additional information relevant to Elise's possible status as a Indian child would have been available had the Department conducted a more thorough inquiry. The Department argues it is "mere supposition" that more relevant information was available. Some courts have held that notice errors are harmless error where the relevant parent *never* asserted, either in the trial court or on appeal, Indian heritage. (*In re N.E.* (2008) 160 Cal.App.4th 766, 770–771; *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1431; but see *In re J.N.* (2006) 138 Cal.App.4th 450, 461–462.) Here, however, Eric claimed in the trial court that his father and grandfather were enrolled members of the Cherokee Nation. In similar circumstances, another division of this District held that an agency's failure to adequately inquire into and investigate a father's claim of Indian heritage was not harmless error even though the father had "not made an 'affirmative representation that further information showing Indian connection sufficient to invoke ICWA is indeed available,' or 'sa[id] what that information is.' " (*In re A.G., supra,* 204 Cal.App.4th at p. 1401.) Distinguishing *In re N.E.*, where the appellant made " '[no] showing whatsoever that the interests protected by the ICWA [we]re implicated in any way,' " the *In re A.G.* court wrote, "Here, in sharp contrast, Father expressed his claim of Indian heritage from the

14

beginning, and he provided the Agency with sufficient information to trigger its obligation to make further inquiry," but the agency's inquiry and notice to the tribes was inadequate. (*Ibid.*; see also *In re Mary G., supra,* 151 Cal.App.4th at pp. 211–212 [where parents disclosed Indian ancestry below but agency investigation was allegedly inadequate, parents do not need to show on appeal that further investigation would show minor was Indian child]; cf. *In re Brandon T.* (2008) 164 Cal.App.4th 1400, 1414 [omission of information from notice was harmless where record demonstrated that omitted information was not relevant to determining whether minor was Indian child].)

Other cases relied on by the Department are distinguishable. *In re Levi U.* (2000) 78 Cal.App.4th 191 was decided before the 2006 changes in state notice requirements. In *In re K.M.* (2009) 172 Cal.App.4th 115, the "Agency gave notice to the tribes identified by K.M.'s grandmother and provided the names of K.M.'s grandfather and grandmother and great-grandmother and great-grandfather and all other information the Agency was able to obtain from [the mother] and grandmother. The record shows the Agency attempted on several occasions to elicit further information from the child's family, but was unsuccessful due to the family's hostility toward the Agency." (*Id.* at p. 119.) The mother nevertheless argued that termination of her parental rights should be reversed because the Agency did not interview the child's great-grandmother. However, the grandmother had refused to provide contact information for the great-grandmother, and none of the tribes that had been contacted suggested K.M. was or might be a tribal member. (*Id.* at pp. 118–119.) Here, in contrast, one of the tribes requested specific additional information, which suggested Elise might be member of that tribe, and Ramano made only a belated and limited effort to contact Eric's mother (or other relatives) to obtain the additional information the tribe needed. We further note that Eric did not make a vague claim of possible Indian ancestry generations in his past, but stated that both his father and grandfather were *enrolled* members of a tribe. (Cf. *id.* at p. 117 [mother claimed "she was, or might be, a member of the 'Cherakia' tribe," and agency notified the Cherokee tribes].)

15

All of the cases we discuss were decided prior to the very recent decision of the United States Supreme Court in *Adoptive Couple v. Baby Girl* (2013) 570 U.S.___ [133 S.Ct. 2552] (*Adoptive Couple*). While not directly applicable to the ICWA notice issues presented here, the Supreme Court considered application of ICWA to circumstances where, as here, the parent alleging Indian heritage *never* had custody of the Indian child. (*Id.* at p. 2560.) The high court found that "[W]hen an . . . Indian child . . . has never been in the Indian parent's legal or physical custody, there is no 'relationship' that would be 'discontinu[ed]' [consistent with the definition of 'breakup'] . . . by the termination of the Indian parent's rights" (*id.* at pp. 2562–2563), and that ". . . ICWA's primary goal of preventing the unwarranted removal of Indian children and the dissolution of Indian families is not implicated." (*Id.* at p. 2561.) In *Adoptive Couple*, however, unlike the instant case, the non-Indian mother voluntarily relinquished the child. Here in contrast, Mother, who is a "parent" under literal language of the ICWA (25 U.S.C. § 1903(9) [" 'parent' means any biological parent . . . of an Indian child"]), actively contests the termination of her parental rights on ICWA grounds. However, the implicit rationale of *Adoptive Couple* appears to be that an "Indian family" (which is not defined in the ICWA) does not exist unless the *Indian* parent has had custody of the child, thus implicating the law's purpose of "preventing the unwarranted . . . dissolution of *Indian families*." (*Id.* at p. 2561, italics added.) Because Eric never had custody of Elise, under the reasoning of *Adoptive Couple* his "continued custody" is not at issue and the ICWA would not be implicated in the section 366.26 determination insofar as Mother was concerned. Under such circumstances, remand for ICWA compliance would change nothing regarding termination of Mother's parental rights and any ICWA error would be harmless as to her. "Parents unable to reunify with their children have already caused the children serious harm; the [ICWA] rules do not permit them to cause additional unwarranted delay and hardship, without any showing whatsoever that the interests protected by the ICWA are implicated in any way." (*In re Rebecca R., supra*, 143 Cal.App.4th at p. 1431.)

16

But application of *Adoptive Child* to the differing circumstances presented here was never considered in the trial court or briefed by the parties here, nor was the effect of lack of adequate ICWA notice in the first instance a factor before the Supreme Court in *Adoptive Child*. These questions may, or may not, arise on remand in the event a tribe, after proper notice, seeks to intervene. It is therefore premature for us to consider what application, if any, *Adoptive Child* may have in this case. On this record, we cannot deem the notice violations harmless.

B.      *Mother's Requests for New Attorney or Self-Representation*

Mother argues the trial court violated her due process rights by failing to hold a hearing on her request to represent herself at the contested section 366.26 hearing. We affirm.

1.      *Factual Background*

In May 2012, Mother's attorney notified the court that Mother wanted new counsel or permission to represent herself. The court held a *Marsden*-type hearing,[13] where Mother complained that her counsel had failed to submit certain evidence to the court, object to misrepresentations made on the record by opposing counsel, challenge the jurisdictional allegations, and take certain unspecified actions to improve her chances at reunification. She also complained that, after she fired her first attorney, her case was transferred to an attorney in the same dependency counsel contract firm without her knowledge. After hearing counsel's response, the court noted that there were "several previous attorneys [Mother was] unhappy with" and advised her that "you don't get to appoint your own attorney." The court told Mother that any replacement counsel would have to be appointed from the contract law firm, and asked Mother is she wished to withdraw or maintain her *Marsden* request. Mother chose to withdraw her *Marsden* request. At this hearing, she did not specifically ask to be allowed to represent herself.

At the start of the September 2012 section 366.26 hearing, Mother raised a number of objections on her own behalf—she wanted a friend in the courtroom to take notes

---

[13] *People v. Marsden* (1970) 2 Cal.3d 118.

because she had been unable to get transcripts of prior hearings, and she wanted the case heard by a judge rather than a commissioner. When her requests were denied in part because they were untimely, she said, "[E]very time I try and discuss something I'm informed that I have counsel that is responsible for doing that. I have addressed this issue with counsel already, and it hasn't been addressed to the Court. I also asked that these two pages be submitted into the record requesting a continuance and . . . to represent myself pro per or be appointed new counsel immediately [¶] . . . [¶] . . . We had less than an hour before you guys at the settlement [conference]. I am not getting a fair trial right now. . . . He and I both are supposed to have our points heard, . . . ." The court denied her requests without further discussion or inquiry.

2. *Analysis*

Mother had a statutory right to self-representation during the dependency proceedings. (*In re A.M.* (2008) 164 Cal.App.4th 914, 923; *In re Angel W.* (2001) 93 Cal.App.4th 1074, 1083.) Section 317, subdivision (b) provides that the court *shall* appoint counsel for an indigent parent in a case where the children have or might be removed from the home "*unless* the court finds that the parent or guardian has made a knowing and intelligent waiver of counsel . . . ." (Italics added; see also rule 5.534(g), (h).) A request for self-representation may be denied if the court in its discretion determines that granting the request would cause substantial disruption or delay in the proceedings. In exercising its discretion, the court must weigh the parent's right to self-representation against the child's right to a prompt and fair disposition of the case. (*In re A.M.*, at pp. 924–926.) The standard is similar to the standard a trial court applies when a represented defendant wishes to dismiss his attorney during trial and represent himself: " '[T]he trial court shall inquire *sua sponte* into the specific factors underlying the request[,] thereby ensuring a meaningful record in the event that appellate review is later required[,] . . . [and consider] other factors . . . [including] the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption *or*

18

delay which might reasonably be expected to follow the granting of such a motion.' "
(*Id.*, at p. 926, quoting *People v. Windham* (1977) 19 Cal.3d 121, 128–129.)

We again find a very limited record to review. Mother proffered two pages "requesting a continuance and . . . to represent myself pro per or be appointed new counsel" and asked that they be filed, but they are not in the record. Without the benefit of either Mother's papers or of further on-the-record inquiry by the court, we cannot know whether Mother elaborated in writing, or could have elaborated orally, specific reasons for her request for self-representation at that particular hearing. We also do not know whether her request for self-representation was contingent on a grant of her request for a continuance or, if so, the extent of the continuance she had requested.

We conclude, however, that any error was harmless. The parties disagree about the applicable standard of reversible error. Mother argues denial of self-representation is structural error that is reversible per se. She notes that the California Supreme Court has held the right to appointed counsel in dependency proceedings is one of the "significant due process safeguards . . . built into the dependency scheme" to protect parents' "basic civil right" to the care, companionship and custody of their children. (*In re James F.* (2008) 42 Cal.4th 901, 904.) She argues the juvenile court's alleged denial of a hearing on her request for self-representation was a due process violation that should be deemed structural error. However, the *James F.* court also held, "If the outcome of a proceeding has not been affected, denial of a right to notice and a hearing may be deemed harmless and reversal is not required. [Citation.]" (*Id.* at p. 918.) In other words, harmless error analysis applies. Mother next argues that, if harmless error analysis applies, we should apply the *Chapman*[14] standard for federal constitutional error. The underlying right to self-representation here, however, is not a constitutional but a state statutory right. Therefore, we apply the *Watson*[15] standard: we must decide whether there is a reasonable

---

[14] *Chapman v. California* (1967) 386 U.S. 18.

[15] *People v. Watson* (1956) 46 Cal.2d 818.

19

probability that, had Mother been allowed to represent herself at the section 366.26 hearing, the outcome of the hearing would have been different.

We conclude any error by the court was harmless under the *Watson* standard. First, insofar as the record discloses, the court acted within its discretion in refusing to allow Mother to represent herself at the hearing. There were no apparent deficiencies in counsel's performance. Mother's orally stated reasons for the request referred to past disputes with her attorney that did not directly relate to the presentation of her case at the section 366.26 hearing. Mother's request was tardy: although Mother had previously presented and withdrew a *Marsden* motion, she did not assert her right to self-representation until the commencement of the final hearing in the case. Granting the request would almost certainly cause delay, and Elise had an interest in obtaining permanency as soon as possible, an interest that was particularly salient at the section 366.26 stage of the proceedings where the focus has shifted from the parents' interest in their children to the child's interest in stability. (See *In re Marilyn H.* (1993) 5 Cal.4th 295, 309 ["[o]nce reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability"].) Second, Mother has made no showing that if she had been allowed to represent herself she would have presented evidence or argument that could have changed the outcome of the case. Instead, she only makes unsupported assertions that she could have presented additional evidence. Mother testified at the hearing and cites nothing in the record that demonstrates she was restricted from presenting her full case to the court. We conclude there was no reversible error.

C.      *Mother's Section 388 Petition*

Mother argues the trial court erred in denying her a full evidentiary hearing on her section 388 petition. We affirm.

1.      *Factual Background*

As noted *ante*, Mother filed a section 388 petition in July 2012 asking that Elise be returned home with family maintenance services or that her visitation be increased and the section 366.26 hearing delayed or cancelled. As changed circumstances, she cited her return to therapy in recent weeks, cooperation with the prosecution of Eric in 2012,

20

avoidance of Eric and Jason J., participation in a domestic violence program, employment, plans to complete a paralegal program, sobriety and participation in A.A., and plans for stable housing that would accommodate her and her children. To demonstrate why changes to the court's orders would be in the children's best interest, she cited the strong bond between her and the children, her regular participation in visitation, and the benefit of keeping all of the siblings together.

In opposition to similar petitions filed in the Siblings' case, the Department submitted the two police reports discussed *ante*, which described the January 30–31, 2012 domestic violence incident involving Eric and the June 2012 contact between Mother and Eric after his release from custody.

At a July 13, 2012 hearing, the court gave the parties an opportunity to be heard on the section 388 petitions for all three children. The Department asked the court to deny the petitions without a hearing. It argued the allegations of the petitions were vague or conclusory and thus failed to establish a prima facie case, particularly in light of the police reports: "She still is going from a group of people, going to go off by herself with [Eric] to deescalate the situation. That's classic codependence. [¶] He was then incarcerated. The day he gets out of jail, we have this second police report from June 5th, 2012, where the police officer saw the two subjects, [Eric] and [Mother], walking eastbound together. [¶] . . . [¶] So, . . . as far as change of circumstances, there is nothing that supports that. [¶] As to . . . the best interests of the children, the Court's got the [section 366.26] report." Mother argued the petitions should be liberally construed for purposes of determining whether to schedule a hearing and that her petitions met the prima facie standard.

The court confirmed with Mother that she had received and had an opportunity to review the police reports, then denied a hearing on all three section 388 petitions. "The Court is most persuaded by the very recency of the 11:00 p.m. meeting with [Eric] that . . . is clear evidence that there's no change of circumstances here. . . . [T]he Court, frankly, cannot accept [it] as happenstance . . . [as it] occurred on the very day he was released from jail . . . ."

21

2.    *Analysis*

A parent "may, upon grounds of change of circumstance or new evidence, petition the court . . . to change, modify, or set aside any order of court previously made . . . . [¶] . . . [¶] . . . If it appears that the best interests of the child . . . may be promoted by the proposed change of order, . . . the court shall order that a hearing be held . . . ." (§ 388, subds. (a)(1), (d).) "The court may deny the petition ex parte if: [¶] . . . the petition . . . fails to state a change of circumstance or new evidence that may require a change of order . . . or . . . that the requested modification would promote the best interest of the child . . . ." (Rule 5.570(d)(1) ["Denial of hearing"].) "A petition for modification must be liberally construed in favor of its sufficiency." (Rule 5.570(a).) If a hearing is held, the party that brings the petition bears the burden of persuasion. (Rule 5.570(h)(1).) The juvenile court's ruling on the petition is reviewed for abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

Mother raised the same objections she makes here in her appeal of the termination order in the Siblings' case. (*In re Adan R.* (June 6, 2013, A136151) [nonpub. opn.].) In our opinion in that appeal we found no error, and we reiterate that analysis here. "The trial court did not abuse its discretion in denying a full evidentiary hearing on the petitions. The court could have denied the petition ex parte. On the issue of changed circumstances, the petitions alleged at most *changing* circumstances, i.e., a renewal of Mother's efforts to address the problems that led to the children's dependency: her return to therapy, her alleged avoidance of men who were substance abusers and perpetrators of domestic violence (and cooperation in [Eric's] prosecution), her enrollment in a domestic violence counseling program, and her efforts to obtain gainful employment and stable housing. However, '[a] petition which alleges merely *changing* circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests. [Citation.]' (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47, italics added.) The changed circumstances alleged in Mother's petitions on their face were too little and too late in the three-and-

22

one-half-year dependency case to justify further delay in adopting a permanent plan for the children.  (Cf. *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 526–527 [changed circumstances existed where 'home was no longer in an unsafe and unsanitary condition,' where condition of home had led to the dependency].)

"Mother argues the court applied an incorrect legal standard when it required a 'material change of circumstances' even though the statute only requires a 'change of circumstances.'  We disagree.  Common sense dictates that the 'change of circumstance' standard must include a materiality element as measured by the purpose of the statute; otherwise, the mere passage of time would suffice to reopen prior orders upon an appeal to the children's best interests.  Courts recognize this implicit materiality standard by referring to 'a genuine change of circumstance' (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250) and a change of circumstances 'which may make the modification of a prior order appropriate' (*In re Daijah T.* (2000) 83 Cal.App.4th 666, 674) when discussing the section 388 standard.

"Finally, Mother argues her due process rights were violated because 'the court neither summarily denied mother's petition[s] nor did it grant mother a hearing.  Instead, the court heard argument from the parties regarding mother's petition[s] before denying the petition[s] without allowing mother a full evidentiary hearing.'  We agree there was some ambiguity in the court's actions.  The court ruled that it would 'deny the hearing' on the petitions, presumably because the allegations of the petition failed to make a prima facie showing.  However, in explaining its reasons, the court cited evidence:  the police reports and the bonding study.  The court even took pains to verify that Mother had received the opposition evidence and had had an opportunity to review it, apparently to allay any concerns that her due process rights might be violated if the court relied on the evidence.  Nevertheless, even if we assume that the court in fact held a hearing on the petitions and denied them on their merits, Mother has failed to show reversible error.  The court was not required to conduct the hearing with live testimony, but was free to rely on the information contained in the petition, documentary evidence, and argument of counsel.  (Rule 5.570(h)(2); *In re E.S.* (2011) 196 Cal.App.4th 1329, 1340; *In re C.J.W.*

23

(2007) 157 Cal.App.4th 1075, 1080–1081.) Nothing in the record suggests that the court denied the petitions because Mother did not offer evidence in support of the specific factual allegations in her petitions; rather, the court inferably concluded that those facts, if assumed to be true, were insufficient to justify a change in the court's orders. Moreover, nothing in the record suggests that Mother was denied an opportunity during the hearing to challenge the police report or bonding study evidence or to offer additional evidence (or at least make an offer of proof) in support of her petitions. Finally, she makes no showing on appeal that, had she been given an opportunity to present additional evidence or further argument on the petitions, there was a reasonable probability of a different result." (*In re Adan R., supra,* A136151.)

Mother has not established reversible error in the court's disposition of the section 388 petition.

D.      *Termination of Parental Rights*

Mother also challenges the court's order terminating her parental rights to Elise, arguing the court should have found that the beneficial parent relationship exception applied.[16] We affirm.

1.      *Factual Background*

Mother testified that she had visited Elise as often as she was allowed and that during the visits she snuggled, fed, taught, played with, and read to Elise. She maintained that she never ignored Elise when she was visiting all three children at once, although acknowledged her attention was necessarily divided at times. She never disciplined Elise, but would take away objects she should not be touching and distract her toward

_____

[16] Mother also argues that the court should have considered the beneficial sibling relationship exception to termination of parental rights, even though she did not urge the court to apply that exception at the September 18, 2012 hearing. The party seeking application of the exception bears the burden of establishing that the section applies. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343.) Therefore, Mother's failure to pursue this argument at the termination hearing resulted in a forfeiture. In any event, the Department's section 366.26 report noted that the exception did not apply on practical grounds: the Siblings were likely to move out of state to live with a paternal relative who was not willing to take Elise.

24

other activities. Elise called Mother "Mommy," crawled into Mother's lap, and kissed pictures of Mother and the Siblings. Elise was very excited to see her at the start of visits, and became upset when the visits ended. As the visits became more infrequent (Mother had not seen Elise in seven weeks as of the time of the section 366.26 hearing), Elise showed less distress at separation. Mother testified it would be traumatizing for Elise if her relationship with Mother were ended.

The Department conceded that Mother had regularly visited Elise. The social worker acknowledged that the visits went well: Elise was affectionate with Mother and receptive to Mother's affection. However, she opined that Mother was "more of an adult [Elise] recognizes" than a parent figure to her. Elise showed some anxiety separating from her foster mother and the social worker interpreted her use of "Mommy" as referring to the foster mother, wondering where she had gone. At the end of the visits, Elise was eager to return to the foster mother. Mother asked for a continuance so that she could show video recordings of her visits with Elise, but the court denied the request.

In argument, Mother's counsel contended that the evidence established Mother had regularly visited Elise and Elise would benefit from continuing the relationship, and contended Mother should not have to prove the benefit of keeping the relationship outweighed the benefits of adoption. Counsel noted that Mother was Elise's sole caregiver during her first seven months of life, and argued Mother had played the role of a parent, not a friend, during her visits with Elise because she fed her, paid attention to her developmental milestones, taught her, and appropriately disciplined her. Counsel for the Department noted that Mother's visits with Elise had never progressed to unsupervised visits, and "[e]ven frequent, loving contact with natural parents to whom a child cannot be returned may be insufficient" to support a beneficial parental relationship exception to termination of parental rights. Minor's counsel supported the Department's position.

2.     *Analysis*

At a section 366.26 hearing, the juvenile must determine by clear and convincing evidence whether it is likely the dependent minor will be adopted. (§ 366.26,

subd. (c)(1).)  If the court finds a likelihood of adoption, the court must terminate parental rights and order the child placed for adoption unless, as applicable here, it finds a "compelling reason" that termination would be detrimental under one of the exceptions listed in section 366.26 subdivision (c)(1)(B).  A party arguing that one of those exceptions applies has the burden of producing evidence that establishes the exception. (*In re Lorenzo C., supra,* 54 Cal.App.4th at p. 1343 [discussing former § 366.26, subd. (c)(1), predecessor of § 366.26, subd. (c)(1)(B)].)

Under the beneficial parental relationship exception, the court must find a "compelling reason" that termination of parental rights would be detrimental because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  "The existence of interaction between the natural parent and child will always confer some incidental benefit to the child."  (*In re Lorenzo C., supra,* 54 Cal.App.4th at p. 1342.) The beneficial parental relationship exception requires more, "that the parent-child relationship promote the well-being of the child to such a degree that it outweighs the well-being the child would gain in a permanent home with new, adoptive parents. [Citation.]"  (*Ibid.*)

We review the trial court's decision either for substantial evidence or for abuse of discretion; in this context, there is little difference between these standards of review. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351–1352.)

The trial court's ruling here is supported by the record and was not an abuse of discretion.  It was undisputed that Elise had spent the first seven months of her life in Mother's care and that their visits had been nurturing and affectionate.  However, substantial evidence showed that Elise did not have trouble separating from Mother at the end of the visits and she had formed a parent-child bond with her foster parents.  Because she was only an 18-month-old child, the benefits of a permanent placement were particularly strong in her case.  There simply was insufficient evidence of a strong bond between Mother and Elise that might outweigh the benefits of adoption.

26

### III.    DISPOSITION

The September 18, 2012 order terminating Mother's rights is vacated.  The case is remanded to the juvenile court with directions to order the Department to make a complete record of ICWA notice efforts and to reconsider, consistent with the views expressed in this opinion, whether the Department complied with ICWA notice requirements and order further efforts if necessary.  If further efforts are required and, after proper notice, the court finds the child is an Indian child, the court shall proceed in conformity with ICWA.  If, after proper inquiry and notice, the court finds the child is not an Indian child, the order terminating Mother's rights shall be reinstated.


_____
Bruiniers, J.


We concur:


_____
Simons, Acting P. J.


_____
Needham, J.


27